**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
       pkim@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TYLER SANDERS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TAHOE RESOURCES INC., C. KEVIN MCARTHUR, RONALD W. CLAYTON, MARK SADLER, and ELIZABETH MCGREGOR,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tyler Sanders ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tahoe Resources Inc.

1

("Tahoe" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Tahoe from March 12, 2015 through July 5, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions, and subsequent damages, took place within this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Tahoe explores, develops, and operates mines in the Americas. The Company is incorporated in British Columbia, Canada and its principal executive offices are located at 5310 Kietzke Lane, Suite 200 Reno, Nevada. The Company holds interest in the Escobal mine property comprising 23.7 million tonnes of proven and probable mineral reserves located in southeast Guatemala. The Company's securities are traded on New York Stock Exchange ("NYSE") under the ticker symbol "TAHO."

8. Defendant C. Kevin McArthur ("McArthur") was the Company's Chief Executive Officer from November 10, 2009 until August 16, 2016 and a member of its Board of Directors throughout the Class Period.

9. Defendant Ronald W. Clayton ("Clayton") has been the Company's President and Chief Executive Officer and a member of its Board of Directors since August 16, 2016.

10. Defendant Mark Sadler ("Sadler") was the Company's Vice President and Chief Financial Officer from March 7, 2013 until August 16, 2016.

11. Defendant Elizabeth McGregor ("McGregor") has been the Company's Vice President and Chief Financial Officer since August 16, 2016.

12. Defendants McArthur, Clayton, Sadler and McGregor are sometimes referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

3

 (a) directly participated in the management of the Company;

 (b) was directly involved in the day-to-day operations of the Company at the highest levels;

 (c) was privy to confidential proprietary information concerning the Company and its business and operations;

 (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

 (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

 (f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

 (g) approved or ratified these statements in violation of the federal securities laws.

14. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

17. On March 12, 2015, the Company filed a Form 40-F for the fiscal year ended December 31, 2014 (the "2014 40-F") with the SEC, which provided the Company's year-end financial results and position. The 2014 40-F was signed by Defendant McArthur. The 2014 40-F

4

also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants McArthur and Sadler attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

18. The Company's Annual Information Form for the year ended December 31, 2014, attached as an exhibit to the 2014 40-F, stated the following:

> *Developments Regarding Indigenous Peoples*
>
> To the best of our knowledge, although indigenous people may have inhabited the area at one time, there are no indigenous populations currently living in the immediate area of the Escobal mine site. In 2014, the Company engaged with indigenous communities that expressed an interest in the Escobal mine and to date, more than 70 indigenous community members have visited the Escobal mine. In addition, indigenous peoples have participated in the Company's avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments through its social investment program. The Company also attended workshops with the Guatemalan government and other private sector organizations to promote the elimination of all forms of racial discrimination against indigenous groups.
>
> According to Guatemala's most recent census--National Institute of Statistics (Census 2002)--SRLFs population is 99.6% "Ladino", meaning of Hispanic origin and non-indigenous. Nevertheless, laws and movements respecting the acquisition of lands and other rights of indigenous communities may alter decades-old arrangements made by prior owners of the lands where the Escobal mine is located. We used commercially reasonable efforts in our dealings to ensure all land-related agreements were entered into in accordance with applicable laws, but there is no guarantee that future laws and actions will not have a material adverse effect on our operations at the Escobal mine or on our financial position, cash flow and results of operations.

19. On March 25, 2016, the Company filed a Form 40-F for the fiscal year ended December 31, 2015 (the "2015 40-F") with the SEC, which provided the Company's year-end financial results and position. The 2015 40-F was signed by Defendant McArthur. The 2015 40-F also contained signed SOX certifications by Defendants McArthur and Sadler attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20. The Company's Annual Information Form for the year ended December 31, 2015, attached as an exhibit to the 2015 40-F, stated the following:

*Developments Regarding Indigenous Peoples*

To the best of our knowledge, although indigenous people may have inhabited the area of our Mines at one time, there are no indigenous populations currently living in the immediate area of the Escobal, La Arena or Shahuindo Mine sites. In 2015, MSR engaged with indigenous communities in Guatemala that expressed an interest in the Escobal Mine and during the year, more than 130 indigenous community members visited the Escobal Mine. In addition, indigenous peoples have participated in our Guatemalan avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments through its social investment program. The Company also attended workshops with the Guatemalan government and other private sector organizations to promote the elimination of all forms of racial discrimination against indigenous groups.

21. On March 10, 2017, the Company filed a Form 40-F for the fiscal year ended December 31, 2016 (the "2016 40-F") with the SEC, which provided the Company's year-end financial results and position. The 2016 40-F was signed by Defendant Clayton. The 2016 40-F also contained signed SOX certifications by Defendants Clayton and McGregor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

22. The Company's Annual Information Form for the year ended December 31, 2016, attached as an exhibit to the 2016 40-F, stated the following:

*Developments Regarding Indigenous Peoples*

To the best of our knowledge, although indigenous people may have inhabited the area of our Mines in Guatemala and Peru at one time, there are no indigenous populations currently living in the immediate area of the Escobal, La Arena or Shahuindo Mine sites. In 2016, MSR engaged with indigenous communities in Guatemala that expressed an interest in the Escobal Mine and during the year, more than 130 indigenous community members visited the Escobal Mine. In

addition, indigenous peoples have participated in our Guatemalan avocado and coffee rust prevention programs and received donations of agricultural supplies and musical instruments through its social investment program. The Company also attended workshops with the Guatemalan government and other private sector organizations to promote the elimination of all forms of racial discrimination against indigenous groups.

In Canada, we are committed to direct, bilateral engagements with aboriginal groups to explore opportunities for positive relations and mutual benefit. To this end, the Company is party to IBAs with local First Nations in respect of the Timmins operations that provide for education and training of First Nations members, employment opportunities, environmental care, and collaborative business opportunities. The Company entered into an IBA with five First Nations in respect of the Bell Creek Mine, effective September, 2016 and an IBA with two First Nations in respect of the Timmins West Mine, effective February, 2011. The Company will continue to engage and consult with aboriginal groups in accordance with the laws of Canada.

23. The statements referenced in ¶¶ 17-22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) consultation obligations relating to the permitting of the Escobal mining license were not met; (2) in turn, the Escobal mining license is subject to suspension; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

24. On May 24, 2017, the Company disclosed a legal claim for violating the Xinca indigenous people's right of consultation in advance of granting the Escobal mining license to Tahoe's Guatemalan subsidiary, stating in part:

**Tahoe Reports On Legal Claim In Guatemala**

NEWS PROVIDED BY
Tahoe Resources Inc.
May 24, 2017, 07:45 ET

VANCOUVER, British Columbia, May 24, 2017 /PRNewswire/ -- Tahoe Resources Inc. (TSX: THO, NYSE: TAHO) ("Tahoe" or the "Company") today reported that the Company has learned that an anti-mining organization, CALAS, has filed a claim against Guatemala's Ministry of Energy and Mines ("MEM") alleging that MEM violated the Xinca indigenous people's right of consultation in advance of granting the Escobal mining license to Tahoe's Guatemalan subsidiary, Minera San Rafael.

The last official census shows the San Rafael community to be overwhelmingly non-indigenous. Based on the lack of indigenous communities in or around the mine, and the fact that both MEM and Minera San Rafael participated in and documented hundreds of public and private meetings and open consultations in and around the mine area dating back to 2010, the Company believes that the claim by CALAS is without merit. Minera San Rafael consulted with a number of indigenous people during its many meetings.

Ron Clayton, President and CEO of Tahoe Resources Inc., commented: "This is an attempt by an anti-mining NGO to oppose mining and other development in Guatemala despite the many benefits that these projects bring to local communities. Given the extensive consultation and socialization process followed by both MEM and Minera San Rafael leading to issuance of the Escobal license, we are confident that the current claim is without merit. We responsibly conduct our business in alignment with international standards and consistently demonstrate an on-going commitment to Guatemalans through employment, skills training, tax and royalty payments and sustainability programs. As a result, we continue to enjoy significant community and government support within the country. This is best demonstrated by the success of our Escobal operation since we reached commercial production in January 2014."

Under Guatemalan law, MEM has 48 hours from the date of notice (May 23, 2017) to issue a response to the Supreme Court, after which the Supreme Court is expected to issue an initial ruling in the next four weeks.

The claim has had no impact on existing operations at the mine which continues to meet or exceed the Company's 2017 guidance.

25.     On this news, shares of the Company fell $0.08 per share from its previous closing price to close at $9.18 per share on May 24, 2017, damaging investors.

26.     On July 5, 2017, the Company disclosed that the Supreme Court of Guatemala temporarily suspend the license to operate the Escobal mine, stating in part:

**Guatemalan Lower Court Issues Ruling On Tahoe's Mining License**

NEWS PROVIDED BY
Tahoe Resources Inc.
Jul 05, 2017, 17:08 ET

VANCOUVER, British Columbia, July 5, 2017 /PRNewswire/ -- Tahoe Resources Inc. (TSX: THO, NYSE: TAHO) ("Tahoe" or the "Company") today reported that the Company has learned that the Supreme Court of Guatemala has issued a provisional decision in respect of an action brought by the anti-mining organization, CALAS, against Guatemala's Ministry of Energy and Mines ("MEM"). The action alleges that MEM violated the Xinca Indigenous people's right of consultation in advance of granting the Escobal mining license to Tahoe's Guatemalan subsidiary, Minera San Rafael. The provisional decision is in respect of a request by CALAS for an order to temporarily suspend the license to operate the Escobal mine until the action is fully heard. The Company understands that no Xinca representative or community is currently participating in the CALAS lawsuit against MEM.

The provisional decision suspends the Escobal mining license of Minera San Rafael while the action is being reviewed by the court. The Company was not a party to the action commenced by CALAS and did not previously have standing to make submissions to the court in respect of the provisional application. This decision confers legal standing on the Company which will now take all legal steps possible to have the ruling reversed and the license reinstated as soon as possible, including immediately appealing the decision to the Constitutional Court.

The Guatemala Supreme Court is the initial trial court in Guatemala for constitutional actions filed against MEM. Appeals from these decisions are heard by Guatemala's Constitutional Court. Based on a prior ruling by the Constitutional Court involving consultation obligations with respect to a large natural resource project, the Company believes that its operating license should remain in effect while any additional consultation is completed. Accordingly, the Company intends to both appeal the decision to the Constitutional Court and ask for the Supreme Court to reconsider its provisional ruling.

The Company believes that all consultation obligations relating to the permitting of the Escobal license were met. The last official census shows the San Rafael community to be 98.6% non-indigenous and with no Xinca community presence. Despite the fact that the Escobal mine is not located in or impacting any indigenous communities of Guatemala, the Company understands that MEM held a consultation process that complied with the requirements set forth in ILO Convention 169.

Based on its prior experience with Guatemalan court proceedings and evaluation of similar cases before the courts, the Company estimates the Constitutional Court could rule on the appeal within two to four months. We will be seeking to have the license reinstated during this period.

The Company also plans to file a motion for reconsideration with the Supreme Court, which is the lower court that issued the provisional decision. Based on prior cases, the Company cannot predict when the Supreme Court would rule on the motion for reconsideration.

In addition, the Company will also be requesting the Supreme Court to resolve CALAS's definitive constitutional claim. The definitive constitutional claim and appeal process could take between 12 and 18 months.

While the Company cannot determine at this time when or if the suspension will be rescinded and the license will be reinstated, including for purposes of conducting a consultation process, we believe ILO 169 does not apply here, and if it did apply, was already met. We understand that the effect of ruling in favour of CALAS could mean that consultation must occur before the suspension is revoked. It could also mean, as happened in similar cases in Guatemala, that the court could allow operations to resume while a consultation process is conducted. We believe that the timeframe to undertake the consultation processes, and for a reconsideration of our application for the issue of the license, could be in the range of six to 12 months.

Upon formal receipt of the order temporarily suspending the license for Escobal, the mine will be placed on stand-by and is planned to be maintained in a manner such that full production can be expeditiously resumed on a reversal of the suspension. During this time, the Company will continue to maintain its high standard of security and environmental protection.

Ron Clayton, President and CEO of Tahoe Resources Inc., commented: "We are extremely disappointed in the Court's ruling suspending the license because we believe that there are no indigenous communities affected by Escobal's operations. While the lack of indigenous communities in our area makes ILO 169 inapplicable, there is nevertheless extensive documentation evidencing that an ILO 169 consultation process was in fact conducted in the area of the mine. We are acutely aware that an adverse ruling could have a significant adverse impact on our shareholders, partners, employees, vendors and community populations, as tax and royalty payments, along with purchases of operating supplies will be suspended during any period that the mine is not operating. Escobal is our flagship mine which has been designed and operated to meet the highest environmental standards and we will make every effort to remove any suspension and bring Escobal back into operation as soon as possible. We remain committed to protecting our employees' livelihoods, as well as those livelihoods of the

Company's suppliers and the thousands of Guatemalan families that benefit from the responsible operation of the Escobal mine."

The Company's preliminary Q2 results include production of over 4 million ounces of silver, more than 110 thousand ounces of gold, revenue of greater than $200 million and an estimated cash balance of over $165 million. There are no significant inventories of concentrate on hand.

Depending upon the success of the Company's appeal and the timing of court rulings, the Company anticipates, assuming a three-month suspension period resulting in a deferral of production to a future period, the following impacts could be expected:

2017 silver production would be deferred to future periods by 5.1 million ounces;
Sales and operating costs associated with deferred production would be incurred in future periods;
Sustaining capital expenditures of $12 million would be deferred;
Fixed costs of approximately $10 million would be incurred;
Exploration efforts in Guatemala of $0.5 million would not be incurred; and
Estimated royalties of $4 million and taxes of $5 million related to deferred production would not be accrued; payments would resume upon recommencement of production and sales.
Given the possible material impact of suspending operations at the Escobal mine, the Company will be reevaluating previous multi-year guidance and can also no longer confirm previously issued 2017 guidance at this time. Long term care and maintenance plans are under consideration by management and further updates will be provided when that evaluation is complete.

The Company plans to host a conference call to answer questions regarding the suspension of the Escobal license on Thursday, July 6, 2017 at 5:00 a.m. PT (8:00 a.m. ET). Those wishing to join the call can do so using the telephone numbers listed below.

Participant call-in numbers:

    +1-800-319-4610 (toll free from Canada and the U.S.)
    +1-604-638-5340 (from outside Canada and the U.S.)

27. On this news, shares of the Company fell $2.74 per share or over 33% from its previous closing price to close at $ 5.56 per share on July 6, 2017, further damaging investors.

28. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Tahoe during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NYSE, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

36. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon

plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

42. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

43. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

44. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially

inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

45. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

46. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

47. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

50. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the

17

Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

51. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

52. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

53. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 7, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

Counsel for Plaintiff